1
2
3
4
5
6
7
8                        **UNITED STATES DISTRICT COURT**

9                            **DISTRICT OF NEVADA**

10

11   HUGO ISRAEL CAHUEC,                    Case No. 3:09-cv-00113-RCJ-RAM

12                   Petitioner,            **ORDER**

13         v.

14   GREGORY SMITH, et al.,

15                   Respondents.

16

17   **I.      Introduction**

18          This is a habeas corpus action under 28 U.S.C. § 2254.  Currently before the court are the

19   second amended petition of Hugo Israel Cahuec (ECF No. 87), respondents' motion to dismiss

20   (ECF No. 94), Cahuec's opposition (ECF No. 99), and respondent's reply (ECF No. 102).  The

21   action is untimely under 28 U.S.C. § 2244(d)(1), and the sole issue before the court now is

22   whether Cahuec can demonstrate actual innocence to bypass the statute of limitations.  The court

23   finds that Cahuec has not demonstrated actual innocence, and the court dismisses the action.

24   **II.     Facts**

25          On the night of December 2, 2003, the following people, among others, were at a church

26   in Las Vegas, Nevada:  S.G., a 4-year-old girl; two of S.G.'s brothers; I.G., their father;[1] Cesar

27   _____

28   [1] S.G. was a minor at the time, and her name needs to be redacted.  LR IC 6-1(a).  The court redacts the names of
     S.G.'s parents because it would not be difficult to find S.G.'s name if the court used the names of the parents.

                                              1

1    Mendoza, the church's pastor; Isabel Mendoza, Cesar's wife; and Cahuec.  The pastor and I.G.

2    were inside the church, in a meeting.  Cahuec was moving pieces of wood, described as 2x4s in

3    the defense investigation report, Ex. 44 (ECF No. 17-45 at 3), from the church into the pastor's

4    van.  S.G. and at least one brother were outside with Cahuec, though that brother later went inside

5    the church.  The meeting ended, and I.G. took S.G. and her brothers home.  Sa.G., S.G.'s mother,

6    was working at her job at the time.  She returned home around 1:00 a.m.  I.G. was asleep at the

7    time, and he needed to wake up around 3:00 a.m. to go to his job.  Ex. 44 (ECF No. 17-45 at 2).

8           On the morning of December 3, 2003, Sa.G. was at home with S.G. while I.G. was at his

9    job.  S.G. told Sa.G. that it hurt to urinate.  Ex. 4 at 16 (ECF No. 17-5 at 5).  Sa.G. examined

10   S.G.'s vagina and saw that it was reddish but was not bleeding.  Ex. 44 (ECF No. 17-45 at 2).

11   S.G. told Sa.G. that Cahuec had put S.G. into the pastor's car, pulled down her pants and

12   underwear, touched her with his finger, and that it hurt.  Ex. 106 (ECF No. 73-49).  S.G.

13   demonstrated to Sa.G. that Cahuec had rubbed her vagina.  Id. at 25-26 (ECF No. 17-5 at 8).

14   Shortly thereafter, I.G. called.  Sa.G. asked him what had happened at the church.  I.G. said that

15   S.G. had said that something had happened, but he was not certain what it was or how serious it

16   was.  Sa.G. took S.G. to a medical clinic.  Apparently, the clinic's staff called the police, and an

17   ambulance took S.G. the hospital.  Ex. 44 (ECF No. 17-45 at 2).

18          At the hospital, Dr. Michael Zbiegien examined S.G.  He found no cuts, bruising, or

19   redness in S.G.'s vagina.  Ex. 114 at 21 (ECF No. 74-3 at 22).  His report indicated possible

20   sexual abuse and inconsistent statements.  Ex. 114 at 22 (ECF No. 74-3 at 23).

21          Detective Art Chavez of the Las Vegas Metropolitan Police Department took S.G.'s

22   statement.  The interview was in Spanish, later translated and transcribed into English.  S.G. said

23   that Cahuec had put her into the front of the pastor's car.  Ex. 42 at 8-9 (ECF No. 17-43 at 9-10).

24   She said that Cahuec had touched her on her tail.  Ex. 42 at 7-8 (ECF No. 17-43 at 8-9).

25   Detective Chavez testified later that S.G. was pointing to her vagina when she used the Spanish

26   word for tail.  Ex. 112 at 77-78 (ECF No. 74-1 at 78-79).  S.G. said that Cahuec put his hand

27   under her pants but on top of her underpants.  Ex. 42 at 10 (ECF No. 17-43 at 11).  At the state-

28

2

1   court evidentiary hearing,[2] Detective Chavez testified that S.G. did not describe an act of sexual

2   penetration.  Ex. 112 at 88 (ECF No. 74-1 at 89).

3        Detective Chavez spoke with Cahuec later on December 3, 2003.  Cahuec said that, as

4   noted above, he was loading wood into Cesar's van.  S.G. and her brothers were outside with him,

5   either helping or hindering him.  After he loaded the van, he found that the rear doors would not

6   close.  He started to unload the wood to try to load the van in a way that the rear doors would

7   close.  He took each piece of wood out by sliding it beside and behind him.  One time, he hit S.G.

8   in her vagina.  She fell to the ground crying.  He picked her up and put her into the rear of the

9   van.  He then put his hand under her pants and underpants, and he rubbed her vagina to soothe

10  her.  Cahuec explained that he put S.G. into the van because he did not want any passers-by to see

11  what he was doing.  Ex. 41 at 5-24 (ECF No. 17-42 at 6-25).  Detective Chavez asked Cahuec,

12  "Explain to me why you didn't just rub her outside of her shorts.  Why did you have to put your

13  hand inside?"  Cahuec responded, "I don't know.  I don't know what got into me.  The truth.  I

14  can't tell you this, I don't know.  But in that instant, I lifted just . . ."  Ex. 41 at 24 (ECF No. 17-42

15  at 25).  Cahuec disputed the accuracy of that translation.  He hired an interpreter to translate the

16  interview from the recording.  In that unofficial translation, his answer was, "I don'tt [sic] know, I

17  don't know why I did it, really, I can't tell you that, if I don't know, but at that moment I lifted her

18  like that."  Ex. 115 (ECF No. 74-4 at 37).  Detective Chavez arrested Cahuec.  At the evidentiary

19  hearing, Detective Chavez noted that in either translation, Cahuec did not say specifically that he

20  had sexually penetrated S.G.  Ex. 112 at 150 (ECF No. 74-1 at 113).

21       Cahuec testified at the evidentiary hearing.  His testimony was consistent with his

22  statement to Detective Chavez.  Ex. 112 at 194-251 (ECF No. 74-1 at 195-252), Ex. 113 at 5-12

23  (ECF No. 74-2 at 6-13).

24       The defense investigation report differs from Cahuec's statement with regard to S.G.'s

25  brothers.  According to the investigator, I.G., Jr., age 10 at the time, said:

26       he was not outside when the alleged incident took place.  He does state that he was
         with his father inside the church, when his little sister, [S.G.] came in to tell her
27       father what had happened to her.  I asked [I.G., Jr.] if it was light or dark outside,

28  _____

    [2] All mentions of an evidentiary hearing refer to this state-court evidentiary hearing.

3

1
2

and his response was that it was dark.  I asked him also if his sister was crying when she came into the church, and his response was no.  He did indicate that she seemed upset.  [I.G., Jr.] thought that it was probably around 7:00 p.m."

3

Ex. 44 (ECF No. 17-45 at 1).  E.G. told the investigator that he had helped Cahuec with the wood

4

before he went into the church.  E.G. said that S.G. and I.G., Jr. also were outside, then they all

5

went into the church.  E.G. did not recall whether S.G. then went back outside alone.  Id. (ECF

6

No. 17-45 at 1).

7

When asked at the preliminary hearing, Sa.G. testified that S.G. never mentioned that

8

Cahuec had hit her with a piece of wood.  Ex. 4 at 27 (ECF No. 17-5 at 8).

9

S.G. testified at the preliminary hearing.  She said that Cahuec had poked her with his

10

finger in her vagina, under her clothes.  Ex. 4 at 51-52 (ECF No. 17-5 at 14).

11

In 2010, Isabel Mendoza executed a declaration.  She stated that on the night of December

12

2, 2003, she was working in the church's shop.  Cahuec entered the shop and said that he had hit

13

S.G. with a piece of wood.  Ex. 45 (ECF No. 17-46).

14

Also in 2010, Cesar Mendoza executed a declaration.  He stated that Sa.G. called him in

15

the morning of December 3, 2010, told him what S.G. had told her, and asked if she should take

16

S.G. to the doctor.  He told Sa.G. to do what she needed to do.  Later that day, Sa.G. called him

17

again.  Sa.G. told him that the doctor had examined S.G. and concluded that she had not been

18

raped.  Ex. 46 (ECF No. 17-47).

19

In 2012, Abigail Goldman, an investigator for the Federal Public Defender, contacted

20

S.G.'s parents.  Eventually, she arranged to meet the parents alone at a McDonald's.  At that

21

meeting, according to Sa.G., she informed them that Cahuec had received a life sentence; Sa.G.

22

had thought that Cahuec already had been released from prison.  Ex. 112 at 30 (ECF No. 74-1 at

23

31).  Sa.G. recalled that they spoke about sexual intent and penetration.  Id. at 32 (ECF No. 74-1

24

at 33).  I.G. recalled the same.  Ex. 104 at 97-98 (ECF No. 74-1 at 98-99).  Sa.G. also recalled

25

that Goldman said that Cahuec was in court proceedings, trying to clear up something that Sa.G.

26

could not remember.  Ex. 112 at 34-35 (ECF No. 74-1 at 35-36).  Goldman asked the parents to

27

talk with S.G. about what happened on December 2, 2003.  Id. at 35-36 (ECF No. 74-1 at 36-37).

28

I.G. said that they wanted to think things over before letting S.G. speak with Goldman, to not hurt

4

1   S.G.  Ex. 104 at 88 (ECF No. 73-47 at 89).  They spoke with S.G.  Ex. 104 at 89 (ECF No. 73-47

2   at 90 (I.G.'s testimony), Ex. 112 at 39 (ECF No. 74-1 at 40) (Sa.G.'s testimony).

3         In 2013, the parents called Goldman.  They arranged a meeting with themselves, S.G.,

4   Goldman, and a translator.  S.G.'s initial recounting of events was substantially the same as her

5   statements back in 2003 and 2004.  Ex. 107 (ECF No. 73-50 at 2).[3]  Cahuec pulled down both her

6   pants and her underwear.  Id. (ECF No. 73-50 at 3).  Then he touched her in her vagina.  Id. (ECF

7   No. 73-50 at 3).  Cahuec's fingers went inside her vagina.  Id. (ECF No. 73-50 at 3-4, 5).  S.G.

8   remembered that it hurt.  Id. (ECF No. 73-50 at 6).  She remembered Cahuec looking around for

9   people, seeing a lady walking, and then backing off of her to say hello or something else to the

10  lady.  Id. (ECF No. 73-50 at 4).  She remembered that she and her brothers were outside because

11  somebody needed help moving wood.  Id. (ECF No. 73-50 at 4).  She did not remember being hit

12  by wood because she did not think that it had happened.  Id. (ECF No. 73-50 at 4).  The following

13  exchange then occurred:

14          AG:  At the trial, you didn't testify.  Do you remember going to court?  And I think
            you were, were you in the courtroom when the testimony happened?
15
16          SG:  I think.

            AG:  I think so.  But your mom testified for you.  At trial, when your mom
17          explained that you had told her that he was loading wood and he hit you in the
            crotch with the wood.
18
19          SG:  Um, I don't remember.

            AG:  Okay.  Do you think it could have happened, or do you think that . . .
20
21          SG:  I don't think, I don't think so . . .

22          AG:  You don't remember there being wood or anyone loading wood?

            SG:  I remember there was wood but I don't, I don't, I don't remember that.
23

24  Id. (ECF No. 73-50 at 4-5).  S.G. thought that Cahuec told her not to say anything to anybody.

25  Id. (ECF No. 73-50 at 3).  S.G. remembered telling her father at the church what had happened,

26  but her father did not believe her.  Id. (ECF No. 73-50 at 5).  S.G., however, knew what had

27  _____
    [3] Goldman recorded the interview on her iPhone.  After returning to the office, she made an informal transcript,
28  which is Exhibit 107.  Much later, when she tried to retrieve the recording, she learned that an update to the iPhone
    irretrievably deleted the recording.

1    happened, so she told her mother the next morning.  Id. (ECF No. 73-50 at 5).  S.G. did not

2    remember Cahuec trying to pat or rub her to soothe her.  Id. (ECF No. 73-50 at 6)  S.G. thought

3    that the touching was sexual.  Id. (ECF No. 73-50 at 6).  I.G. and Goldman then discussed that

4    what would help Cahuec is S.G. both remembering being hit by wood and asserting that the

5    touching was not sexual.  Id. (ECF No. 73-50 at 7).  Goldman then read Cahuec's explanation of

6    events to S.G.  Id. (ECF No. 73-50 at 7).  Sa.G. wondered why Cahuec's prison sentence was so

7    long.  Id. (ECF No. 73-50 at 11).  I.G. said that they were willing to do whatever they needed to

8    do to help Cahuec.  Id. (ECF No. 73-50 at 11).  They offered to help get the medical records, and

9    Goldman said that even with those records, if S.G. maintained that Cahuec touched her sexually,

10   then the records would not matter.  Id. (ECF No. 73-50 at 12).  S.G. then said that she did not

11   think that the touching was sexual.  Id.  (ECF No. 73-50 at 12).  I.G. then told Sa.G., "It's

12   basically all on her (the daughter).  It's not me or you (he or his wife)."  Id. (ECF No. 73-50 at

13   13).  Sa.G. said that when the family went to speak with "an attorney," probably a prosecutor,

14   they told the attorney that they did not want to charge Cahuec with a crime, but the attorney told

15   them that that decision was not theirs to make.  Id. (ECF No. 73-50 at 13).  Goldman responded:

> It's true, I mean, if something illegal happened, they have the obligation to make
> an arrest.  I can tell you that in our experience, children are very easy to influence,
> I think children want to please police officers, I think children can be encouraged
> to say things or exaggerate, but really all that matters is your memory of it.  And,
> um, it's extra difficult because so much time has passed, and the more time that
> goes by, the fainter the memory gets, and you stop remembering the wood, you
> stop remembering exactly what happened, and that's why it helps to just hear the
> other side, and take some time and just sit with it, and see, and try to come to some
> certainty.  I mean, right now, how do you feel?

21   Id. (ECF No. 73-50 at 13) (emphasis added).  S.G. then said that she started to remember Cahuec

22   hitting her with wood.  Id. (ECF No. 73-50 at 13-14).  Her memory of Cahuec penetrating her

23   with a finger faded away.  Id. (ECF No. 73-50 at 15).  She said that Cahuec helped her up and

24   rubbed her vagina to soothe her.  Id. (ECF No. 73-50 at 15).  Goldman said that if S.G. now truly

25   believed that explanation of events, then S.G. would need to write all that down in a declaration.

26   Id. (ECF No. 73-50 at 16-17).  Goldman later testified at the evidentiary hearing that she read

27   Cahuec's explanation to S.G. because S.G.'s initial explanation of events had inconsistencies with

28

1  prior statements and S.G. did not seem certain about what she remembered.  Ex. 114 at 87 (ECF

2  No. 74-3 at 88).

3        After the interview, S.G. wrote a sworn statement by hand.  She stated:

4        Hello my name is [S.G.].  I am 13 years old now about to turn 14 in days.  Well
   the reason why I'm writeing [sic] this letter is so you guys can hear what happed
5  [sic].  I remember Hugo was unloading wood from the van and that he accidently
   hit me with one of the pieces of wood, on my private parts.  I was on the floor
6  crying because so he playced [sic] me on the van and he was rubbing my private
   parts so it could feel better but it was a misunderstanding because it was <u>NOT</u>
7  sexualI.  I'm sorry because of this misunderstanding I didn't want him to go to jail.

8  Ex. 66 (ECF No. 73-9).  Two weeks later, she signed a sworn, typed declaration.  She stated:

9        1.     My name is [S.G.].  I am thirteen years old.  I am the same [S.G.] police
   interviewed in 2003 about Hugo Israel Cahuec.  I testified at Cahuec's preliminary
10 hearing in 2004, when I was four years old.

11       2.     On April 4, 2013, I wrote a statement describing what happened with Hugo
   and I on December 2, 2003.  I wrote the attached statement freely and was not
12 forced by anyone to do so.  It is true to the best of my knowledge and belief.

13       3.     When Hugo was rubbing me, at no point did his finger or any part of his
   body enter my genital opening.
14

15 Ex. 65 (ECF No. 73-8).

16       At the evidentiary hearing, S.G. testified to the same.  She also testified that she would not

17 lie to have Cahuec released from prison.  She testified that she changed her mind about what

18 happened after Goldman told her what Cahuec had said.  Ex. 104 at 35 (ECF No. 73-47 at 36).

19 She also testified that Cahuec's statement helped her remember, and that it did not tell her what to

20 remember.  <u>Id.</u> at 36 (ECF No. 73-47 at 37).

21       Sa.G. testified at the evidentiary hearing.  She recalled S.G. telling her on the morning of

22 December 3, 2003, that it hurt for S.G. to urinate.  Ex. 104 at 120 (ECF No. 73-47 at 121).  S.G.

23 told her that Cahuec had touched in her vagina, but Sa.G. did not remember whether S.G. said

24 that Cahuec's finger went inside her.  Ex. 104 at 120, 121 (ECF No. 73-47 at 121, 122).  Sa.G.

25 also testified that hospital staff told her that S.G. was not penetrated.  Ex. 104 at 120 (ECF No.

26 73-47 at 121).  On cross-examination, Sa.G. had no memory of telling a police officer named

27 Denton that S.G. said that Cahuec had removed S.G.'s pants and underwear and then put his

28 fingers into S.G.'s vagina.  Ex. 112 at 29 (ECF No. 74-1 at 30).

I.G. executed a declaration.  He stated, "At the time, I remember members of the church were organizing and moving planks of wood inside the church.  Though considerable time has passed, I believe [S.G.] may have told me that Cahuec accidentally hit her with a piece of wood. I did not think what happened to my daughter was serious."  Ex. 64 (ECF No. 73-7).  Then he said, "I believe [S.G.] was so young when this incident occurred that she did not know the difference between a touch meant to sooth an injury and a touch that is sexual.  I believe Cahuec may have accidentally hit my daughter in the groin with wood, and then attempted to rub her as one rubs a child's injury."  Id.  He continued, "If my daughter had told me or given me the slightest impression that Cahuec had touched her sexually, removed her pants or removed her underwear, I would have immediately reacted.  Had my daughter told me something so serious had occurred, I believe I would remember it today.  I have no memory of my daughter telling me Cahuec touched her sexually while at church."  Id.

I.G. testified at the evidentiary hearing:

Q      The statement that you just mentioned when, exactly, was it made to you?

A      When we were leaving the church.  When we were heading home.  Inside the vehicle when we were going home.

Q      Okay.  When—what exactly—to the best of your memory, what did your daughter tell you?

A.      That's what she told me.   The best I can remember that he had hit her with a wooden stick—a beam near her private area.

Q      Did she tell you that he had rubbed the area?

A      I don't recall exactly but I believe she did say that.

Q      Did she ever tell you that part of his finger had gone inside of her?

A      No, I don't recall her saying that.

Q      Was what she said to that night, was that something that was a matter of concern to you?

A      It concerned me in a way but I did not consider that as serious.

Ex. 104 at 86 (ECF No. 73-47 at 87) (direct examination).

Q      . . . My question is the first time that you learned about Hugo touching your daughter is when your wife, [Sa.G.], called you at work following the evening that everyone went to church?

8

1    A    I don't recall exactly.

2    Q    Okay.

3    A    I don't recall that she was at work. And next day, what I recall is when—
     that she found out. But I don't recall exactly.

4

5    Q    Okay. And then she called you and told you she wanted to call the police
     and take your child to the doctor, correct?

6    A    I remember that her—well, we both went to the hospital. No, I'm sorry. I
     believe I was at work—I don't remember exactly.

7

8    Q    Okay. Did you tell your wife when you got home from church that your
     daughter had been hit by a board and injured?

9    A    I don't recall, but I don't think I told her that because she was coming home
     very late from work, like around one or two in the morning.

10

11   Q    Did [S.G.] tell you that evening that Hugo had rubbed her on her vaginal
     area or her genital area?

12   A    No, she did not say that.

13   Q    Did you not just say on direct examination that she said he rubbed her
     vagina to Mr. Norwood?

14

15   A    No, what she said to me is that he had hit her with that wooden beam. That
     he had rubbed her but she never mentioned that it was on her vagina, that exact
     area.

16

17   Q    Where did you think that he rubbed her?

     A    Well, near her private parts but not on her private parts.

18

19   Q    Did Hugo come into you at any time that night at the church and tell you
     your daughter was hurt?

20   A    I don't remember but I don't think so.

21   Q    Okay. Was your daughter crying at church that night?

22   A    No, I did not see her crying. When we got home I think I remember her
     complaining about mild pain, little pain.

23

24   Ex. 104 at 93-94 (ECF No. 73-47 at 94-95).

25        Dr. Zbiegien testified at the evidentiary hearing. He testified that he saw no sign of sexual

26   abuse. Ex. 114 at 20-22 (ECF No. 74-3 at 21-23). However, he noted that if there were no cuts

27   or bruises, then redness could heal quickly. Id. at 32 (ECF No. 74-3 at 33). It was possible for

28   labial skin to be rubbed at 9:00 p.m. one day, when the incident occurred, and not have any

9

redness by 4:30 p.m. the next day, when he examined S.G.  Id. at 33 (ECF No. 74-3 at 34).  He then testified:

> Q       Okay.  Is it unusual, in your experience, during sexual assault examinations that when the alleged conduct is rubbing of the genital area including the labia, not necessarily putting fingers in the vagina, but just rubbing sufficient for, what we call, legal penetration versus medical penetration, I guess, is it unusual that you see nothing?
>
> A       It's not unusual
>
> Q       Is it, in fact, more usual that you see nothing?
>
> A       It's very usual that we don't.  In fact one of the axioms, if you will, in this— in the study is that it's normal to be normal.  So you can have a normal examination in conjunction with touching.

Id. at 33-34 (ECF No. 74-3 at 34-35).  Dr. Zbiegien completed a form report, on which a box indicating inconsistent statements was marked.  He explained that he marked that box because while there was a statement, nobody made a statement to him specifically.  Ex. 114 at 29 (ECF No. 74-3 at 30).

## II.     Procedural Background

### A.      Definitions of offenses

Three offenses are at issue in this case:  Sexual assault, lewdness with a child under the age of 14, and first-degree kidnapping.  The definitions and possible sentences for these offenses as they existed around the time of the incident in December 2003 are essential for understanding Cahuec's plea agreement.

#### 1.     Sexual assault

The version of the sexual assault statute in effect in December 2003 stated, in relevant part:

> 1. A person who subjects another person to sexual penetration, or who forces another person to make a sexual penetration on himself or another, or on a beast, against the will of the victim or under conditions in which the perpetrator knows or should know that the victim is mentally or physically incapable of resisting or understanding the nature of his conduct, is guilty of sexual assault. [. . .]
>
> 3. [A] person who commits a sexual assault against a child under the age of 16 years is guilty of a category A felony and shall be punished:
>
> (a) If the crime results in substantial bodily harm to the child, by imprisonment in the state prison for life without the possibility of parole.

(b) Except as otherwise provided in paragraph (c), if the crime does not result in substantial bodily harm to the child, by imprisonment in the state prison:

(1) For life with the possibility of parole, with eligibility for parole beginning when a minimum of 20 years has been served; or

(2) For a definite term of 40 years, with eligibility for parole beginning when a minimum of 15 years has been served.

(c) If the crime is committed against a child under the age of 14 years and does not result in substantial bodily harm to the child, by imprisonment in the state prison for life with the possibility of parole, with eligibility for parole beginning when a minimum of 20 years has been served.

Nev. Rev. Stat. § 200.366 (2003).  "Sexual penetration," as defined in December 2003, "means cunnilingus, fellatio, or any intrusion, however slight, of any part of a person's body or any object manipulated or inserted by a person into the genital or anal openings of the body of another, including sexual intercourse in its ordinary meaning."  Nev. Rev. Stat. § 200.364(2) (1999).

### 2.　　Lewdness with a child under the age of 14 years

The version of the lewdness statute in effect in December 2003 states, in relevant part:

1. A person who willfully and lewdly commits any lewd or lascivious act, other than acts constituting the crime of sexual assault, upon or with the body, or any part or member thereof, of a child under the age of 14 years, with the intent of arousing, appealing to, or gratifying the lust or passions or sexual desires of that person or of that child, is guilty of lewdness with a child.

2. [A] person who commits lewdness with a child is guilty of a category A felony and shall be punished by imprisonment in the state prison for:

(a) Life with the possibility of parole, with eligibility for parole beginning when a minimum of 10 years has been served, and may be further punished by a fine of not more than $10,000; or

(b) A definite term of 20 years, with eligibility for parole after a minimum of 2 years has been served, and may further be punished by a fine of not more than $10,000.

Nev. Rev. Stat. § 201.230 (2003) (emphasis added).

### 3.　　The 2003 amendments to sexual assault and lewdness

In 2003, in Assembly Bill No. 78, the Nevada Legislature amended both the sexual assault statute and the lewdness statute in the same act.  2003 Nev. Stat. 2825.  The act itself did not specify an effective date, and thus the amendments became effective on October 1, 2003, around two months before the events in this case.  Nev. Rev. Stat. § 218D.330(1) (formerly Nev. Rev.

11

Stat. § 218.530).  Two changes in possible sentences are relevant to this case.  First,
§ 200.366(3)(b)(2) was amended from a definite term of 20 years, with eligibility for parole
beginning when a minimum of 5 years has been served, to a definite term of 40 years, with
eligibility for parole begging when a minimum of 15 years has been served.  Second § 201.230
was amended to add as a possible sentence a definite term of 20 years, with eligibility for parole
after a minimum of 2 years has been served.  Before the 2003 amendments, the only possible
sentence for lewdness with a child under 14 was life imprisonment with eligibility for parole after
a minimum of 10 years has been served.  The 2003 amendments were in effect in December
2003, at the time of the events in this case.  However, as the court explains below, the sentence
that Cahuec received does not comply with the amended statute.

### 4.      First-degree kidnapping

The definition of first-degree kidnapping has not changed since 1995.  It is:

> 1. A person who willfully seizes, confines, inveigles, entices, decoys, abducts,
> conceals, kidnaps or carries away a person by any means whatsoever with the
> intent to hold or detain, or who holds or detains, the person for ransom, or reward,
> or for the purpose of committing sexual assault, extortion or robbery upon or from
> the person, or for the purpose of killing the person or inflicting substantial bodily
> harm upon the person, or to exact from relatives, friends, or any other person any
> money or valuable thing for the return or disposition of the kidnapped person, and
> a person who leads, takes, entices, or carries away or detains any minor with the
> intent to keep, imprison, or confine the minor from his or her parents, guardians, or
> any other person having lawful custody of the minor, or with the intent to hold the
> minor to unlawful service, or perpetrate upon the person of the minor any unlawful
> act is guilty of kidnapping in the first degree which is a category A felony.

Nev. Rev. Stat. § 200.310.  The relevant punishments for first-degree kidnapping are:

> A person convicted of kidnapping in the first degree is guilty of a category A
> felony and shall be punished: [. . .]

> 2. Where the kidnapped person suffers no substantial bodily harm as a result of the
> kidnapping, by imprisonment in the state prison:

> (a) For life with the possibility of parole, with eligibility for parole beginning
> when a minimum of 5 years has been served; or

> (b) For a definite term of 15 years, with eligibility for parole beginning when a
> minimum of 5 years has been served.

Nev. Rev. Stat. § 200.320.

B.      **Procedural History**

1.      **The initial charge:  Lewdness with a child under the age of 14**

The prosecution originally charged Cahuec with lewdness with a child under the age of 14, Nev. Rev. Stat. § 201.230, on December 11, 2003.  Ex. 2 (ECF No. 17-3).

2.      **Preliminary hearing:  Sexual assault with a minor under the age of 14 and lewdness with a child under the age of 14 (2 counts each)**

On the day of the preliminary hearing, January 26, 2004, the prosecution filed an amended complaint.  It charged Cahuec with two counts of sexual assault with a minor under the age of 14 and two counts of lewdness with a child under the age of 14.  Ex. 5 (ECF No. 17-6).  The justice court bound Cahuec over to the district court on one count of each offense.  The justice court dismissed one count of each offense.  Ex. 4 at 86 (ECF No. 17-5 at 23).

3.      **Information:  Sexual assault with a child under the age of 14 and lewdness with a child under the age of 14**

Consistent with the justice court's ruling, on January 28, 2004, the prosecution charged Cahuec with one count of sexual assault with a child under the age of 14 and one count of lewdness with a child under the age of 14.  Ex. 6.

4.      **Plea agreement:  Sexual assault with a child under the age of 16 and first-degree kidnapping**

On August 24, 2004, the prosecution and Cahuec arrived at a plea agreement.  Cahuec agreed to plead guilty to one count of sexual assault with a child under the age of 16 and one count of first-degree kidnapping.  Ex. 20 (ECF No. 17-21).  The parties stipulated to the sentences.  For the sexual-assault count, Cahuec would receive a sentence of 20 years with parole eligibility starting after a minimum of 5 years.  For the kidnapping count, Cahuec would receive a sentence of life imprisonment with parole eligibility starting after a minimum of 5 years.  The parties could argue whether the court should run the sentences concurrently or consecutively.  Id. The prosecution filed an amended information the same day. Ex. 18 (ECF No. 17-19).  The state district court accepted Cahuec's plea.  Ex. 19 (ECF No. 17-20).  The prosecution filed a second

amended information on September 8, 2004.  Ex. 21 (ECF No. 17-22).  The state district court ran

the sentences consecutively.  Ex. 23 (ECF No. 17-24).

**III.    Discussion**

      **A.    The oddities with the plea agreement**

      At the start of the preliminary hearing, counsel for Cahuec was surprised at the addition of

one more count of lewdness with a child under the age of 14 and two counts of sexual assault

with a child under the age of 14.  Ex. 4 at 6 (ECF No. 17-5 at 3).  She noted, "Your Honor, in

discussion with my client, the minimum he could possibly face would be a 2 to 20 under our new

statute.  This is kind of a huge departure from that if he is now facing 20 to life" for sexual assault

with a child under the age of 14.  Ex. 4 at 7 (ECF No. 17-5 at 3) (emphasis added).  The justice

court later dismissed one count each of sexual assault and lewdness.  The main point, which the

court has emphasized in the quotation of defense counsel, is that counsel knew that about the new

possible, and more lenient, sentence for lewdness.

      As the court described above, the act that created the new sentence for lewdness also

increased the more lenient sentence for sexual assault with a child under the age of 16, from 5-20

years in prison to 15-40 years in prison.  However, at the plea hearing, the prosecutor stated:

> At the time of sentencing, both parties agree that as to count one [sexual assault
> with a child under the age of 16], which could be either a 20 to life or five to 20,
> we would agree to the five to 20, and as to Count two, the first degree kidnapping,
> which is either a five to 15 or five to life, that he would receive the five to life.
> Beyond that, both sides retaining the right to argue, the State retaining the right to
> argue for consecutive time between the counts.

Ex. 19 at 4 (ECF No. 17-20) (emphasis added).  When the judge asked Cahuec what he did that

made him guilty of first-degree kidnapping, the defense counsel and the prosecutor stated:

> MS. ROUNDTREE [defense counsel]:  This may have been legal position for
> purposes of plea negotiations or under certain—I think certain case law.  He
> basically held her for the purposes of committing the offense, which he just
> admitted to, and I think that might also satisfy the elements of the first degree
> kidnapping.  It does not legally—we're waiving defect in the pleading.

> MS. HOLTHUS [prosecutor]:  And beyond that, actually it is technically there, as
> well, because she was on the street outside of the van.  He put her inside of the van
> for purpose—for purposes of the sexual assault.

Ex. 19 at 12-13 (ECF No. 17-20 at 13-14).

1    The first oddity lies with the emphasized portion of the prosecutor's summary of potential

2  sentences for sexual assault with a child under 16.  The sentence for sexual assault on which they

3  agreed, 5-20 years, no longer was a legal sentence.

4    This oddity carried on into the state-court evidentiary hearing.  At the start, respondents'

5  counsel explained:

6
> Just so the Court understands, this case came in, obviously we pretrialed this child
> and the charges changed and that's routine in these type of cases.
7

8
> I can tell you what the Defendant ultimately pled to was a plea accommodation for
> a specific sentence that was sought out by the Public Defender's office.  In other
> words, he was charged with a sexual assault under 14, which was a 20 to life.
9

10
> Back when he entered this plea, a sexual assault under 16 had the potential
> sentence of a 5 to 20.  So that was sought out.  He was not charged with that at the
> beginning.  Nor was he charged with the first degree kidnapping when this case
11
> was filed.  Those were all an accommodation for the plea.  I mean that was what
> was agreed to.  So I just wanted that to be put on the record.
12

13  Ex. 104 at 12-13 (ECF No. 71-49 at 13-14) (emphasis added).  The emphasized clause is

14  incorrect.

15    The parties could not have been ignorant about the amendments to the potential sentences

16  for sexual assault and lewdness, because Cahuec's counsel herself knew about the 2-20 year

17  sentence for lewdness.  The parties could not have failed to realize that the act amending the

18  potential sentences for lewdness also amended the potential sentences for sexual assault, because

19  the same act of the legislature amended the potential sentences for both offenses and because that

20  act amended the sexual-assault statute first.

21    The second oddity lies with the charge that was dropped, lewdness, and the charge that

22  was added, first-degree kidnapping.  Respondents argue that the prosecution dropped the

23  lewdness charge and added the kidnapping charge as part of the plea agreement.  Respondents

24  then argue that the sentence for lewdness, 10 years to life, is greater than the sentence for

25  kidnapping, 5 years to life.  Respondents conclude that Cahuec will need to show that he is

26  actually innocent of both sexual assault, a charge to which he pleaded guilty, and lewdness, a

27  charge the prosecution dropped in favor of the less-serious kidnapping charge.  ECF No. 94 at 6.

28  See also Bousley v. United States, 523 U.S. 614, 624 (1998).  Petitioner counters that the

minimum sentence for lewdness is less than the minimum sentences for sexual assault and for kidnapping, and thus lewdness was not a more-serious charge that the prosecution dropped as part of the plea agreement.  ECF No. 99 at 4 n.2.

If the plea agreement dropped the lewdness charge in favor of the kidnapping charge, then that would imply that Cahuec could have been convicted of both sexual assault and lewdness for one act.  However, lewdness excludes acts that constitute the crime of sexual assault.  Nev. Rev. Stat. § 201.230(1) (2003).  Statutorily, the crimes are mutually exclusive.  Cahuec could not have pleaded guilty to both sexual assault and lewdness based upon the same act.

The third oddity is the range of possible sentences before the 2003 amendments, and it assumes that the parties forgot or did not know about the amendments to the sentences.  The sole sentence for sexual assault with a child under 14 was 20 years to life.  Nev. Rev. Stat. § 200.366(3)(c) (1999).  The possible sentences for sexual assault with a child under 16 were 20 years to life and 5-20 years.  Nev. Rev. Stat. § 200.366(3)(b) (1999).  The sole sentence for lewdness with a child under 14 was 10 years to life.  Nev. Rev. Stat. § 201.230 (1999).  A person could receive less of a punishment for sexual assault with a child under 16 than for lewdness.[4]  As noted above, sexual assault and lewdness are mutually exclusive by statute.  If the parties were assuming that the pre-2003 amendments still were in effect, and if they agreed on a sentence of 5-20 years for sexual assault with a child under 16 years, then lewdness was a more serious offense that the prosecution dropped in exchange for Cahuec's guilty plea to sexual assault with a child under 16 years.

**B.     Cahuec needs to demonstrate actual innocence of lewdness with a minor under 14, sexual assault with a minor under 16, and first-degree kidnapping**

The best way to determine the seriousness of the offenses is to lay out the possible sentences in tables, one for the 1999 version of the statutes and one for the 2003 version of the statutes.  The court does not include aggravating factors such as serious bodily harm or prior convictions.  The court includes the possible sentences for sexual assault without any age element

---

[4] Perhaps even more strangely, the lowest possible sentence for sexual assault, without any other factors, was 10-25 years.  Nev. Rev. Stat. § 200.366(2)(b)(2).  Before the 2003 amendments, a victim under the age of 16 potentially mitigated the sentence for sexual assault.

1  for the purposes of comparison. The court emphasizes the sentence that Cahuec negotiated for

2  sexual assault with a minor under 16.

**1999 Versions**

| Sexual Assault | Sexual Assault < 16 | Sexual Assault < 14 | Lewdness |
|---|---|---|---|
|  | 20 to life | 20 to life |  |
| 10 to life |  |  | 10 to life |
| 10 to 25 |  |  |  |
|  | 5 to 20 |  |  |

**2003 Versions**

| Sexual Assault | Sexual Assault < 16 | Sexual Assault < 14 | Lewdness |
|---|---|---|---|
|  | 20 to life | 20 to life |  |
|  | 15 to 40 |  |  |
| 10 to life |  |  | 10 to life |
| 10 to 25 |  |  |  |
|  |  |  | 2 to 20 |

17      Cahuec will need to prove that he is actually innocent of sexual assault with a child under

18  the age of 14, lewdness with a child under the age of 14, and first-degree kidnapping. The tables

19  show that the sentence for sexual assault with a minor under 16 is the least serious offense

20  possible. This assumes that the parties were free to choose among sentences that the law

21  authorized and sentences that the law no longer authorized. Petitioner argues that the possible

22  sentence of 2-20 years for lewdness is less serious than the sentence for sexual assault with a

23  minor under 16. The court disagrees. Not only were the parties negotiating the offenses in the

24  plea agreement, they were negotiating the sentences for the offenses. Even under the 2003

25  versions, lewdness still has a possible sentence of 10 to life, and Cahuec was trying to avoid that

26  sentence. If the court considers together the negotiated sentences for sexual assault and first

27  degree kidnapping, 5-20 years and 5 years to life, respectively, then the worse possible outcome

for petitioner would have been if the trial court ran those sentences consecutively.  The better

possible outcome for Cahuec would have been if the trial court ran the sentences concurrently,

which effectively would be a sentence of 5 years to life.  That would have been better than a

single sentence of 10 years to life for lewdness.  Additionally, if the sentence that was more

favorable to Cahuec was 5 years to life, then that was the best possible sentence that Cahuec

could negotiate with the prosecution.  Although the statute authorized a potential sentence of 2-20

years for lewdness, it was clear that the prosecution would not agree to that sentence as part of the

negotiations.  To determine otherwise would mean that the prosecution offered a stipulated

sentence of 2-20 years but that Cahuec's counsel rejected that sentence in favor of a sentence that

could be 5 years to life or 10 years to life.  Cahuec makes no claim that counsel acted in such a

way.  The potential sentence of 2-20 years was available to Cahuec only if he decided to go to

trial.  Of course, the possible negative consequences included a potential sentence of 10 years to

life if he was convicted of lewdness or a definite sentence of 20 years to life if he was convicted

of sexual assault of a child under 14, which were two sentences that he wanted to avoid.  In short,

the potential sentence of 2-20 years never was part of the sentence negotiations.  In determining

seriousness of an offense, the court will not consider a possible sentence that the parties

themselves did not consider.

Cahuec needs to demonstrate actual innocence for first-degree kidnapping because, for the

reasons described above, the prosecution could not have dropped the lewdness count in exchange

for the kidnapping count without running afoul of the statutory requirement that lewdness and

sexual assault are mutually exclusive.  However, first-degree kidnapping has two alternative

elements.  In relevant part, the offender must carry away a person with the intent to commit

sexual assault, or the offender must carry away a minor with the intent of perpetrating "upon the

person of the minor any unlawful act."  Nev. Rev. Stat. § 200.310.  Consequently, if Cahuec can

demonstrate actual innocence for sexual assault and lewdness, then necessarily he has

demonstrated actual innocence for first-degree kidnapping.

1    **C.    Standard of review**

2       Actual innocence can excuse operation of the statute of limitations.  <u>McQuiggin v.</u>

3    <u>Perkins</u>, 569 U.S. 383, 386-87 (2013).  A claim of actual innocence requires Cahuec "to support

4    his allegations of constitutional error with new reliable evidence."  <u>Schlup v. Delo</u>, 513 U.S. 298,

5    324 (1995).  "[A] petitioner does not meet the threshold requirement unless he persuades the

6    district court that, in light of the new evidence, no juror, acting reasonably, would have voted to

7    find him guilty beyond a reasonable doubt."  <u>Id.</u> at 329.  The court "must consider all the

8    evidence, old and new, incriminating and exculpatory, without regard to whether it would

9    necessarily be admitted under rules of admissibility that would govern at trial."  <u>House v. Bell</u>,

10   547 U.S. 518, 538 (2006).  "Based on this total record, the court must make 'a probabilistic

11   determination about what reasonable, properly instructed jurors would do.'"  <u>Id.</u> (quoting <u>Schlup</u>,

12   513 U.S. at 329).

13      **D.    The evidence that Cahuec presents either is not new or is not reliable**

14           **1.    Isabel Mendoza's declaration does not contain new evidence**

15      In her declaration, Isabel Mendoza states that Cahuec told her on the night of December 2,

16   2003, that he had accidentally hit S.G. in the crotch with a 2x4.  Taking her declaration as true,[5] it

17   does not contain new evidence.  It repeats what Cahuec told Detective Chavez on December 3,

18   2003.  Isabel Mendoza's declaration has no effect on the actual-innocence analysis.

19           **2.    Cesar Mendoza's declaration does not contain reliable evidence**

20      In his declaration, Cesar Mendoza states that Sa.G. called him after S.G.'s medical

21   examination and told him that S.G. had not been raped.  Again, taking the declaration as true, this

22   is not reliable evidence.  Dr. Zbiegien testified that it was usual for legal penetration to leave no

23   physical signs.  If somebody told Sa.G. that S.G. had not been raped, then that statement was

24   inaccurate for the definition of sexual penetration.  Cesar Mendoza's affidavit has not effect on

25   the actual-innocence analysis.

26

27   _____

28   [5] Cahuec initially planned to call Isabel Mendoza and Cesar Mendoza as witnesses at the evidentiary hearing, but
     then decided not to call them. Ex. 113 at 16 (ECF No. 74-2 at 17).

### 3.     S.G.'s statements from 2013-15 are not reliable evidence

S.G. has a poor memory of the events.  Respondents cite the numerous times in the evidentiary hearing that she said that she did not remember something.  ECF No. 102 at 3. Perhaps she said that she could not remember because she was nervous, but other evidence in the record shows that her statement that Cahuec hit her with a 2x4 is unreliable.

On the night of December 2, 2003, S.G. was 4 years old.  If Cahuec had hit S.G. with a 2x4 in her crotch hard enough to leave red marks and to cause pain in urination the next morning, then S.G. would have been crying and yelling almost immediately and incessantly.  Her brother would have seen and heard her enter the church crying and yelling.  Instead, he saw S.G. enter the church visibly disturbed but silent.  In the church, S.G. would have been crying to I.G. about what had happened.  Instead, I.G. told Sa.G. the next day that he had a vague memory of S.G. telling him something, but he did not know the details until Sa.G. told him.  That next day, S.G. would have told Sa.G. that it hurt to urinate because Cahuec had hit her in the crotch with a 2x4. Instead, S.G. told Sa.G. that it hurt to urinate because Cahuec had touched her in her vagina and that the touching had hurt.  S.G. would have told medical staff that Cahuec had hit her in the crotch with a 2x4.  She did not.  S.G. would have told Detective Chavez that Cahuec had hit her in the crotch with a 2x4.  Instead, she told Detective Chavez that Cahuec had put something unspecified of his into something unspecified of hers and that Cahuec had touched her vagina.  At the preliminary hearing, S.G. would have testified that Cahuec had hit her in the crotch with a 2x4; at the very least, defense counsel would have asked S.G. that question on cross-examination. Instead, S.G. did not so testify, and defense counsel did not ask the question.

S.G. was remarkably consistent for a 4-year-old girl in not saying that Cahuec had hit her in the crotch with a 2x4, at the times closest to the event itself, when the memory and the pain would have been freshest in her mind.  For S.G.'s recollection in 2013-15 that Cahuec had hit her with a 2x4 to be reliable, then some record from 2003-04 would contain a statement that Cahuec had hit her with a 2x4.  S.G. did not make any such statement in 2003-04, and thus her recollection in 2013-15 cannot be reliable.

The court quotes again an exchange from Goldman's interview of S.G. in 2013:

AG: At the trial, you didn't testify.  Do you remember going to court?  And I think you were, were you in the courtroom when the testimony happened?

SG: I think.

AG: I think so.  But your mom testified for you.  At trial, when your mom explained that you had told her that he was loading wood and he hit you in the crotch with the wood.

SG: Um, I don't remember.

AG: Okay.  Do you think it could have happened, or do you think that . . .

SG: I don't think, I don't think so . . .

AG: You don't remember there being wood or anyone loading wood?

SG: I remember there was wood but I don't, I don't, I don't remember that.

Id. (ECF No. 73-50 at 4-5).  Almost everything that Goldman said was not true.  S.G. did testify at the preliminary hearing.  She said that Cahuec had poked her in her vagina.  Sa.G. testified that S.G. never told her that Cahuec had hit her with wood.  Calling the preliminary hearing a trial, with different burdens of proof, was the least of the problems.  Goldman's interview, and S.G.'s subsequent statements, are based on a false premise.  Goldman incorrectly told S.G. that when S.G. was 4, she told Sa.G. that Cahuec had hit her in the crotch with a 2x4.  S.G. told Goldman that she did not remember saying that.  Goldman then read Cahuec's statement to S.G.  Goldman told S.G. that memories fade over time, so perhaps S.G. remembered the touching but forgot about being hit with a 2x4.  S.G. then said that she remembered that Cahuec had hit her in the crotch with a 2x4 and rubbed her vagina to soothe the pain.

That all is wrong.  The reason why S.G. did not remember in 2013 that she had told people in 2003 that Cahuec had hit her in the crotch with a 2x4 is not because, as Goldman suggested, that the memory had faded over time.  The real reason why S.G. did not remember telling people in 2003 that Cahuec had hit her in the crotch with a 2x4 is because S.G. did not tell people in 2003 that Cahuec had hit her in the crotch with a 2x4.  S.G. never had a memory that Cahuec's statement refreshed.

21

Given that S.G.s statements in 2013-15 are based upon a memory of saying something to her mother in 2003 that, in fact, she had not said, S.G.'s statements are not reliable evidence of actual innocence.

### 4.    I.G.'s declaration and testimony are not reliable

I.G. both executed a declaration and testified that on the night of December 2, 2003, S.G. came to him in the church and told him that Cahuec had hit her with a piece of wood.  His declaration and testimony suffer from the same problem of reliability as S.G.  If S.G. did tell him in 2003 that Cahuec had hit her with wood, then some record of that statement would exist.  For example, when he called Sa.G. the next morning and Sa.G. told him what S.G. had said, he would have told Sa.G. that S.G. told him that Cahuec had hit her with a piece of wood.  Instead, he told Sa.G. that he had a vague recollection of S.G. telling him something, but that he could not remember what it was.  As with S.G., he does not mention anything about Cahuec hitting S.G. in the crotch until 2013-15, long after the event.  His declaration and testimony are not reliable.

### E.    Cahuec has not demonstrated actual innocence

### 1.    Cahuec has not demonstrated actual innocence of lewdness with a minor under 14

Cahuec rubbed S.G.'s genitals with his hand.  If he did that "with the intent of arousing, appealing to, or gratifying the lust or passions or sexual desires of that person or of that child," then he did a lewd or lascivious act, and he is guilty of lewdness with a minor.  Nev. Rev. Stat. § 201.230 (1999).  The issue for actual innocence of lewdness with a minor then is whether Cahuec acted with the requisite intent.

The court has explained above why S.G.'s statements in 2013-15 are not reliable evidence that Cahuec had hit her in the crotch with a 2x4 in 2003.  S.G. also said in a declaration that Cahuec's touching of her was not sexual.  S.G. made no such statements of Cahuec's intent back in 2003.  However, a 14-year-old trying to remember what Cahuec's intent was when he touched her at the age of 4 is not reliable evidence of Cahuec's intent.  The memory is too attenuated.

The testimonies of everyone else regarding sexual intent merely derive from S.G.'s statements. Those other people were not in the church's parking lot that night, so they were even more removed from the events.

Cahuec's statement to the police points to the sexual intent necessary for lewdness. Detective Chavez asked Cahuec, "Explain to me why you didn't just rub her outside of her shorts. Why did you have to put your hand inside?" Cahuec responded, "I don't know. I don't know what got into me. The truth. I can't tell you this, I don't know. But in that instant, I lifted just . . ." Ex. 41 (ECF No. 17-42 at 25). Cahuec disputed the accuracy of that translation. He hired an interpreter to translate the interview from the recording. In that unofficial translation, his answer was, "I don'tt [sic] know, I don't know why I did it, really, I can't tell you that, if I don't know, but at that moment I lifted her like that." Ex. 115 (ECF No. 74-4 at 37). Even that translation does Cahuec no favors. When it came to the key question—why was he rubbing S.G.'s genitals under her clothes?—he was at a loss for words. Cahuec did something he knew that others saw as wrong—he stated that he lifted S.G. into the van to keep her and him out of view of anyone else in the area—and he had no explanation why he did it.

The court needs to make a probabilistic determination. Based upon this evidence, the court concludes that it is not more likely than not that any juror would have reasonable doubt. Cahuec has not demonstrated actual innocence for lewdness with a minor to bypass the statute of limitations.

### 2. Cahuec has not demonstrated that he is actually innocent of sexual assault with a minor under 16

The elements of sexual assault differ from lewdness. Sexual assault does not have an element of sexual intent. Sexual assault does have the element of sexual penetration, which lewdness specifically excludes. In this case, the disputed issue is whether Cahuec sexually penetrated S.G.

The evidence given in 2003-04 supports a finding that Cahuec did sexually penetrate S.G. On the evening of December 2, 2003, one of S.G.'s brothers noted that S.G. came into the church looking disturbed, but not crying. The next morning, S.G. told her mother that it hurt to urinate.

Sa.G. looked at S.G.'s vagina, and she saw that it was reddish but without any blood.  S.G. told Sa.G. that Cahuec had touched her in her vagina and that the touching hurt.  At the preliminary hearing, S.G. testified that Cahuec had poked her in her vagina.  A jury could infer from the redness and the pain in urination that Cahuec had sexually penetrated S.G.

The medical evidence does not prove that Cahuec did not sexually penetrate S.G. but is rather inconclusive.  The medical records show, and Dr. Zbiegien testified, that no physical evidence of penetration was present.  However, Dr. Zbiegien testified that if the penetration did not cause any physical injury, then any sign of penetration such as redness could have gone away by the time he had examined S.G.  He also testified that it was usual to "have a normal examination in conjunction with touching."  Ex. 114 at 33-34 (ECF No. 74-3 at 34-35).  The medical evidence is inconclusive on the question of actual innocence.

Based upon the reliable evidence, the court concludes that it is not more likely than not that any reasonable juror would have reasonable doubt that Cahuec committed sexual assault. Cahuec thus has not demonstrated actual innocence of sexual assault with a minor under 16

### 3.  Cahuec has not demonstrated that he is actually innocent of first-degree kidnapping

> 1. A person who willfully seizes, confines, inveigles, entices, decoys, abducts, conceals, kidnaps or carries away a person by any means whatsoever with the intent to hold or detain, or who holds or detains, the person for ransom, or reward, or for the purpose of committing sexual assault, extortion or robbery upon or from the person, or for the purpose of killing the person or inflicting substantial bodily harm upon the person, or to exact from relatives, friends, or any other person any money or valuable thing for the return or disposition of the kidnapped person, and a person who leads, takes, entices, or carries away or detains any minor with the intent to keep, imprison, or confine the minor from his or her parents, guardians, or any other person having lawful custody of the minor, or with the intent to hold the minor to unlawful service, or perpetrate upon the person of the minor any unlawful act is guilty of kidnapping in the first degree which is a category A felony.

Nev. Rev. Stat. § 200.310 (emphasis added).  Cahuec has not demonstrated actual innocence for either lewdness with a minor or sexual assault.  Cahuec told Detective Chavez that he picked up S.G. and put her into the van to conceal from passers-by could what he was doing.  The evidence thus shows that Cahuec concealed a person for the purpose of committing sexual assault, or that Cahuec carried away or detained a minor to perpetrate upon the person the minor any unlawful

1   act.  It is not more likely than not that any reasonable juror would have had reasonable doubt

2   about Cahuec's guilt.  Cahuec has not demonstrated that he is actually innocent of first-degree

3   kidnapping.

4   **V.      Conclusion**

5          To appeal the denial of a petition for a writ of habeas corpus, Petitioner must obtain a

6   certificate of appealability, after making a "substantial showing of the denial of a constitutional

7   right."  28 U.S.C. §2253(c).

8          Where a district court has rejected the constitutional claims on the merits, the
       showing required to satisfy §2253(c) is straightforward:  The petitioner must
9      demonstrate that reasonable jurists would find the district court's assessment of the
       constitutional claims debatable or wrong.  The issue becomes somewhat more
10     complicated where, as here, the district court dismisses the petition based on
       procedural grounds.  We hold as follows:  When the district court denies a habeas
11     petition on procedural grounds without reaching the prisoner's underlying
       constitutional claim, a COA should issue when the prisoner shows, at least, that
12     jurists of reason would find it debatable whether the petition states a valid claim of
       the denial of a constitutional right and that jurists of reason would find it debatable
13     whether the district court was correct in its procedural ruling.

14  Slack v. McDaniel, 529 U.S. 473, 484 (2000); see also James v. Giles, 221 F.3d 1074, 1077-79

15  (9th Cir. 2000).  Ground 3 is a claim that Cahuec's plea was unknowing, unintelligent, and

16  involuntary.  Ground 4 is a claim that Cahuec's trial counsel provided ineffective assistance

17  because she induced Cahuec to enter a plea that was unknowing, unintelligent, and involuntary.

18  Jurists of reason would find it debatable whether these are valid claims of the denial of

19  constitutional rights.  Jurists of reason also would find it debatable whether Cahuec failed to

20  demonstrate actual innocence to bypass the time bar of 28 U.S.C. § 2244(d)(1).  The court will

21  grant a certificate of appealability on that issue.

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

25

1    IT THEREFORE IS ORDERED that respondents' motion to dismiss (ECF No. 94) is

2  **GRANTED**.  This action is **DISMISSED** with prejudice because it is untimely.  The clerk of the

3  court is directed to enter judgment accordingly and to close this action.

4    IT FURTHER IS ORDERED that a certificate of appealability is **GRANTED** on the issue

5  of whether Cahuec has failed to demonstrate actual innocence to bypass the time bar of 28 U.S.C.

6  § 2244(d)(1).

7    DATED:  November 24, 2020.

8                                                                   _____
                                                                    ROBERT C. JONES
9                                                                   United States District Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28